# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | Arlander Keys |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4987 | **DATE** | 6/3/2003 |
| **CASE TITLE** | Chicago District Council Carpenters vs. Tessio Construction | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
 ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Report and Recommendation submitted to Judge Holderman. It is recommended that adverse claimant Oxford Bank & Trust's Motion to Enforce an Adverse Claim [#17] be **granted**. All matters relating to the referral of this action having been resolved, the case is returned to the assigned judge. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 3 | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | JUN 0 4 2003 date docketed | |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| ✓ | Copy to judge/magistrate judge. | | 6/3/2003 date mailed notice | |
| | FT/*secy* courtroom deputy's initials | 03 JUN -3 PM 1:24 Date/time received in Central Clerk's Office | FT mailing deputy initials | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO DISTRICT COUNCIL OF CARPENTERS PENSION FUND<br>Plaintiff,<br><br>v.<br><br>TESSIO CONSTRUCTION CO.,<br><br>Defendant. | Case No. 02 C 4987<br><br>Judge James F. Holderman<br><br>Magistrate Judge<br>Arlander Keys |

TO: THE HONORABLE JAMES F. HOLDERMAN
UNITED STATES DISTRICT COURT JUDGE

**REPORT AND RECOMMENDATION**

Currently before this Court is adverse claimant Oxford Bank & Trust's (the "Bank") Motion to Enforce an Adverse Claim. Plaintiff, Chicago District Council of Carpenters Pension Fund (the "Pension Fund"), and Defendant, Tessio Construction, Inc. (the "Debtor"), entered into an Agreed Judgment to recover contributions that the Debtor owed to the Pension Fund. The Pension Fund sought to satisfy the Agreed Judgment with the proceeds from the Debtor's accounts receivable. The Bank subsequently appeared in this action, contending that, as the Debtor's sole secured creditor, it alone is entitled to the Debtor's accounts receivable. For the reasons set forth below, the Court recommends granting the Bank's Motion.

1



**BACKGROUND FACTS**

The Debtor is a defunct construction company, which has employed numerous skilled trade workers, including carpenters, through the years. To fund its various construction projects and payroll, the Debtor relied upon construction loans from commercial lending institutions. In 1998, the Bank and the Debtor entered into their first loan agreement. The Bank periodically reviewed the terms of the loan, and adjusted the balance to reflect the Debtor's needs and financial status.

As collateral for the loan, the Bank took a security interest in, among other things, the Debtor's existing and future accounts receivable. On August 17, 2000, the Bank filed its first Uniform Commercial Code ("UCC") statement, perfecting its security interest in the Debtor's collateral. In June of 2002, the Bank reduced the commercial loan amount from $1,000,000 to $700,000, but the Bank insists that it was unaware of any financial problems that the Debtor may have been experiencing. The Bank filed a second UCC statement[1] on July 10, 2002, again perfecting its security interest in the Debtor's existing and

---

[1] Specifically, the Security Agreement describes the collateral as all "Inventory, Chattel Paper, Accounts, Equipment and General Intangibles." See Bank's Mot., Ex. A. The UCC financing statement describes the collateral exactly as it is described in the Security Agreement, but further includes the language "whether any of the foregoing is owned now or later acquired." See Bank's Mot. Ex. A, B.

2

future accounts receivables[2]. In July 2002, the Debtor ceased operations and closed its business.

Although the Bank may have been unaware of the Debtor's failing financial health, the Pension Fund was acutely aware of the problem. In March 2002, the Debtor ceased filing its contribution reports and making its payments to the Pension Fund, on behalf of the carpenters it employed. On July 15, 2002, the Pension Fund filed suit against the Debtor, seeking to recover the Debtor's owed contributions, as well as its reasonable attorneys' fees and costs, pursuant to the terms of its Collective Bargaining and Trust Agreements, Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132 (West 2003), and Section 301 of the Taft-Hartley Act, 29 U.S.C. § 185 (West 2003). The case was assigned to Judge James F. Holderman.

On September 25, 2002, an Agreed Judgment was entered against the Debtor in favor of the Pension Fund in the amount of $192,672.83, thereby terminating the case. On October 25, 2002, the Pension Fund filed its Citations to Discover the Debtor's Assets, seeking to claim the monies awarded to it. In an attempt to discover monies owed to the Debtor, which could then

---

[2] This Report & Recommendation later distinguishes between perfecting accounts receivable that the Debtor was entitled to at the time the UCC statement was filed, and future accounts receivable, which would not be perfected until the Debtor was entitled to be paid on those accounts.

3

presumably be used to satisfy the agreed judgment, the Pension Fund served citations upon James McHugh Development, Chicago Carpet World, Craig Greenwood, Johnathan K. Moyer, Triad Construction Services, Wright Construction Services, George Sollitt Construction, Sollitt Construction Company, Ledcor Industries, The Edge construction Company, Gunderson Construction, Inc., Edge Construction, The Drew Company, Capital Construction Group, Alden-Bennett Construction co., Alter Design Builders, Inc. and "Oxford Bands" (sic).

In the interim, the Debtor defaulted on the Bank's loan, leaving an unpaid balance of $417,991.14, plus interest and fees. On February 26, 2003, the Bank filed an adverse claim in this action, seeking to present its claim of entitlement to the Debtor's accounts receivable to cover the defaulted loan amount of $417,991.14, plus interest and late fees. The Bank is seeking to recoup these funds from the Debtor's various account debtors that have outstanding balances owing to the Debtor. Not surprisingly, the Pension fund seeks to rely upon these same account receivables to satisfy its judgment. Judge Holderman referred the Bank's Motion to this Court on March 24, 2003.

**DISCUSSION**

The issue before the Court is whether the Bank's security interest has priority over the Pension Fund's judgment lien with regard to the Debtor's accounts receivable.

4

The Bank insists that it does; because it perfected its security interest long before the Pension Fund received its judgment, the Bank argues, black letter security law dictates that its security interest is superior to the Bank's judgment lien.

In its Response to the Bank's Motion to Enforce its Adverse Claim, the Pension Fund has not cited a single case or statute to contradict the Bank's well-supported position regarding the Uniform Commercial Code ("UCC") and the law of perfection. Instead, the Pension Fund claims that the Bank's Motion should be denied for six primary reasons. First, the Pension Fund claims that this Court does not have the authority to entertain the Bank's Motion. Next, the Pension Fund insinuates that the timing of the Bank's loans were suspicious and casts doubt upon whether the Bank exercised due diligence in loaning the Debtor the sums in question. The Pension Fund then insists - without relying on any authority whatsoever- that permitting the Bank's security interest to take priority over its judgment lien would be contrary to the purposes of ERISA, the Trustees' fiduciary duties, and the equitable interests of the carpenters who labored for these health insurance and retirement benefits.

The Pension Fund then argues that the Bank's Motion is premature, because Alter Designs, one of the many companies owing the Debtor monies, contends that the amounts that it admits it owes to the Debtor "will not be due until Tessio delivers to

5

Alter a Final Waiver of Mechanics Lien." In addition, the Pension Fund argues, the Bank has not yet presented sufficient evidence demonstrating its entitlement to the proceeds, or even verified the exact amount of the debt it is owed. Finally, the Pension Fund contends that the Illinois common fund doctrine prevents the Bank from recovering from the accounts receivable before the Pension Fund's attorneys are paid their fees.

The Court will first address the black letter law regarding security interests - which the Pension Fund neglects to do - and then discuss the Pension Funds's arguments asking the Court to ignore that law.

## A. Priority of Secured Interests

The law unequivocally shows that the Bank's security interest trumps Plaintiff's lien. In order for a security interest to be created in favor of the creditor, the following requirements must be met: (1) the creditor must give value to the debtor; (2) the debtor must have or acquire rights in the collateral; (3) the creditor and the debtor must agree that a security interest shall attach to the collateral; and (4) either the collateral must be in the possession of the creditor or there must be a written security agreement signed by the debtor that contains a description of the collateral. *Metro. Life Ins. Co. v. Am. Nat'l Bank & Trust Co.*, 682 N.E.2d 72, 76 (Ill. App. Ct. 1997); 810 ILL. COMP. STAT. 5/9-203 (2002).

In this case, the Bank has established that it has a security interest against the accounts receivables of the Debtor. First, the Bank has given value to the Debtor by lending it funds. Second, the Debtor has rights in the accounts receivables, because the payments due are for services already performed by the Debtor prior to it ceasing operations. Finally, the Debtor and the Bank entered into a Security Agreement, which describes the collateral covered under the Security Agreement, and includes "[a]ll...Accounts...."

However, the law is clear that in order to have priority over other creditors, attachment of a security interest alone is insufficient. *See,* U.C.C. § 9-308. Instead, the party who first perfects its security interest has the superior right in the collateral. *Internal Revenue Serv. v. McDermott*, 507 U.S. 447, 449 (1993); U.C.C. § 9-322. Perfection of account receivables only occurs when the financing statement is filed and the security interest has attached. *Slodov v. U.S.* 436 U.S. 238, 257 n.22 (1978) (also noting that a perfected security interest is superior to a judgment lien.)

However, a security interest in after-acquired property is not generally perfected when the financing statement is filed, but, rather, when the debtor acquires that property. *McDermott*, 507 U.S. at 449-51. Specifically, a security interest in after-acquired accounts receivable is perfected – assuming the

7

appropriate UCC statement has already been filed - once the debtor completes the work and is entitled to collect payment for that work. *See D&A Partners v. United States of America,* No. CV-96-1234-ST, 1997 WL 328010, at *4 (D. Or. Mar. 12, 1997) ("The account receivable came into existence when Precision earned monies due under the subcontractor agreement by performing work on the project. Thus, the 'property' was 'fixed' by the time Precision completed its performance on the project.")

The Bank filed a UCC financing statement on July 10, 2002, prior to the September 25, 2002 agreed judgment in favor of the Pension Fund, and prior to Pension Fund's filing of its Citations to Discover the Debtor's Assets on October 25, 2002. In addition, the Bank argues -- and the Pension Fund does not deny - that the Debtor obviously became entitled to receive any future accounts receivable prior to the entry of the judgment lien in September of 2002, because the Debtor ceased all operations in July of 2002. Thus, the Bank's security interest in any accounts receivable, due either before or after the UCC statement was filed on July 12, 2002, was perfected prior to the entry of judgment against the Debtor in September of 2002[3]. Therefore, the Bank's perfected security interest is superior to the Pension Fund's judgment lien against the Debtor.

---

[3] Notably, the Pension Fund does not even attempt to dispute the Bank's claim that the Bank's security interest was perfected prior to its lien.

8

## B. The Bank's Motion Is Properly Before the Court

Federal Rule of Civil Procedure 69(a) permits federal courts to hold supplemental proceedings to enforce judgments in accordance with the practice and procedure of the state where the district court is sitting. Fed. R. Civ. P. 69(a). Illinois law provides as follows:

> If it appears that any property, chose in action, credit or effect discovered, or any interest therein, is claimed by any person other than the judgment debtor, the court shall, as in garnishment proceedings, permit or require the claimant to appear and maintain his or her right. The rights of the person cited (other than the judgment debtor) and the rights of any adverse claimant shall be asserted and determined pursuant to the law relating to garnishment proceedings.

735 ILCS 5/2-1402(e) (West 2003). *See also, Schwartz v. Yo-Whip, Inc.*, NO. 92 C 2586, 1994 WL 201024, at *3 (N.D. Ill. May 18, 1994) ("This provision plainly entitled lien holders to assert their rights before a turnover order is entered.") Illinois law permits any third party with an interest in the assets at issue to appear and be heard on their claim. *Michaelson v. Schor*, No. 95 C 6573, 1997 WL 282929, at *3 (N.D. Ill. May 16, 1997) (citing *Resolution Trust Corp v. Ruggiero*, 994 F.2d 1221, 1226 (7th Cir. 1993)). "The procedure is left largely to the judge's discretion, and the proceedings are meant to be swift, cheap, and informal." *Id.*

Illinois law does not require the Bank to formally join this lawsuit in order for it to be heard on its claim to the assets in

9

question; the law only requires the Bank to appear. The Pension Fund's argument that the Court is without authority to entertain the Bank's Motion because the Bank is not a party in this case is without merit.

**C. The Bank's Alleged Lack Of Due Diligence Has No Bearing On the Issue of Priority**

The Pension Fund then insinuates that it was improper for the Bank to extend credit to the Debtor in the spring and/or summer of 2002. However, the Pension Fund has not presented any evidence in support of this assertion. More importantly, the Pension Fund has not cited to any authority suggesting that this "fact" would have bearing on the Court's analysis.

**D. The Pension Fund's Equitable Arguments**

The Pension Fund passionately argues that permitting the Bank's security interest to trump its judgment lien would be contrary to ERISA and the Trustees' fiduciary duties, and would be terribly unfair to the carpenters who worked for the Debtor. Notably, ERISA is devoid of any provisions that would authorize this Court to disregard the Bank's perfected security interest, in favor of the Pension Fund's judicially-created lien. Nor does the UCC suggest that its provisions should apply less stringently in an effort to alleviate harsh consequences when ERISA is merely implicated. Further, the Court fails to see – and the Pension Fund does not articulate -- how the Fund Trustees' fiduciary

10

obligations to the beneficiaries of their Fund has any bearing on the issue at hand.

Finally, the Court is not unsympathetic to the plight of the beneficiaries who *may* be impacted by the enforcement of the Bank's perfected security interest. However, as the Bank points out, the equities are not clearly in the Pension Fund's favor; it is debatable whether the Bank's financing or the carpenters' work played a more significant role in contributing to the creation of the accounts receivable. More importantly, the certainty provided to businesses by the UCC enables commercial enterprises to analyze risk and make business decisions with a certain degree of predictability. The Court is not inclined to abandon this well-established system of relative reliability created by the UCC, simply because it might work a hardship on the Pension Fund's beneficiaries in this case.

### E. The Bank's Adverse Claim is Not Premature

Next, the Pension Fund asserts that the Bank's Motion is premature, because: 1) at least one of the companies owing the Debtor money has not received the necessary final waiver; and 2) the Bank has not presented sufficient evidence demonstrating that it is entitled to a sum equal to or in excess of the balance of the Debtor's accounts receivables.

With regard to the first prong of the Pension Fund's ripeness argument, the Court agrees with the Bank that the

11

Debtor's failure to supply one of the many cited general contractors with sworn statements and waivers does not render the Bank's claim premature. Neither the general contractor nor the Pension Fund deny that the work in question was performed or that the amounts are due, and there is no indication that the Debtor cannot or will not produce these documents. Rather, the contractor merely objects to releasing the sums until it receives the customary waivers. The delay in forwarding these documents to Alter Designs does not render the Bank's claim of entitlement to the Debtor's accounts receivable premature. *See generally, D&A Partners,* 1997 WL 328010, at *4 (a security interest in accounts receivable is perfected when a subcontractor performs work on the project.)

After the Pension Fund complained about the Bank's lack of supporting documentation, the Court advised the Bank to bolster its claim with evidence of the default and the amount due and owing. The Bank attached supporting affidavits to its Reply Brief, which detailed the facts leading up to the default, and identified the elements of the entire amount due, totaling $444,102.02[4]. The Court then offered the Pension Fund the opportunity to respond to that evidence. The Pension Fund did not directly respond to the evidence, but instead asked that, if

---

[4] This amount consists of $417,991.14 of the principal outstanding balance; $11,649.54 of Interest Accrued; $1,315.57 in late charges and $13,145.76 in attorneys' fees and costs.

12

the district court grants the Bank's Motion, the court should limit the amount of recovery to a specific dollar amount.

The Court agrees that the Bank should not be permitted to collect the accounts receivable in excess of the amount due and owing to it from the Debtor. Therefore, the Court recommends that the district court grant the Bank's Motion, but limit its recovery to $444,102.02 of the outstanding accounts receivable.

## F. Common Fund Doctrine

Finally, the Pension Fund argues that the Illinois Common Fund Doctrine prevents the Bank from asserting its claim against the Debtor's accounts receivable. The Court disagrees. The Illinois Common Fund doctrine provides that attorneys who generate a fund are entitled to be paid from that fund prior to the disbursement of those funds to beneficiaries. *See Blackburn v. Sundstrand Corp.*, 115 F.3d 493, 494 (7th Cir. 1997). "The common fund doctrine rests upon the perception that *persons who obtain the benefit of a lawsuit* without contributing to its costs are unjustly enriched." *Bishop v. Burgard*, 198 Ill.2d 495, 509, 764 N.E.2d 24, 33 (2002) (emphasis added) (citing *Boeing Co v. Van Gemert*, 444 U.S. 472, 478 (1980)).

In this case, the Bank is not obtaining a "benefit" from the Pension Fund's lawsuit against the debtor. The Bank is not a member of the class – ie, the beneficiaries of the Pension Fund – who will benefit from the Pension Fund's successful suit against

13

the Debtor, nor is it a subrogee of a beneficiary of the Pension Fund.

To the contrary, the basis of the Bank's recovery is entirely independent of the agreed judgment obtained by the Pension Fund; the Bank's recovery is based upon the Debtor's default, the loan agreement with the Debtor, and the Bank's perfected security agreement. Illinois courts have not extended the Common Fund Doctrine in the manner suggested by the Pension Fund, and this Court declines to recommend such an extension of Illinois law in this case.

## Conclusion

For the foregoing reasons, this Court finds that the Bank's perfected security interest is superior to the Pension Fund's Agreed Judgment, and that the Pension Fund's arguments for ignoring the superiority of the Bank's security interest are without merit. Therefore, the Court recommends that the district court grant the Bank's Motion.


DATED: June 3, 2003        RESPECTFULLY SUBMITTED:

_____
ARLANDER KEYS
United States Magistrate Judge


Counsel have ten days from the date of service to file objections to this Report and Recommendation with the Honorable James F. Holderman. See FED. R. CIV. P. 72 (b); 28 U.S.C. § 636 (b) (1). Failure to object constitutes a waiver of the right to appeal. *Egert v. Connecticut Gen. Life Ins. Co.*, 900 F.2d 1032, 1039 (7th Cir. 1990).